OPINION
Plaintiff-Appellant, Mary Jo Klug (nka Fender) and Defendant-Appellee, Dr. Mark Klug, were divorced on June 23, 1993, after a marriage of about nineteen years. During the divorce proceedings, the parties signed a separation agreement covering property division, child support, alimony, and other pertinent matters. Marital assets were substantial, and included Dr. Klug's medical practice, an office condominium, a residential condominium, various bank and retirement accounts, the marital home and about thirty acres of land surrounding the home, valuable card and coin collections, limited partnership interests, and a 40% share in a 140 unit apartment complex.
As the major part of her property settlement, Mrs. Fender received the marital home and 5.1 acres of land surrounding the home. Dr. Klug valued these items at about 1.3 million dollars at the time of the divorce. However, no appraisal of the home was apparently obtained. Instead, this was Dr. Klug's estimate of what the property was worth. The Klugs purchased the land in 1986 for about $10,000 per acre, and obtained a $500,000 or $550,000 loan to construct the house. Therefore, the total value of the property in question, as of 1986, would have been between $551,000 and $601,000.
Dr. Klug received the rest of the parties' real property and partnership interests (which had been appraised), except for the remaining part of the 30 acre parcel surrounding the house (about 25 acres). The value of these particular assets, without the 25 acre parcel, was about $1,293,142. In addition, Dr. Klug received coin and baseball card collections. The parties also split the money in some bank and retirement accounts. In order to "equalize" the property settlement, Dr. Klug agreed to pay Mrs. Klug an additional $80,000 in four installments. Finally, the 25 acre parcel was to be sold and the proceeds were to be divided between the parties, with Mrs. Klug receiving a slightly larger percentage of profit (54% to 46%).
Regarding the marital residence, the separation agreement provided, in pertinent part, as follows:
 The parties own real property located at 1200 Forest Run, Kettering, Ohio 45429, consisting of approximately thirty (30) acres and a residence.
 The Wife shall retain the residence and five and one tenths (5.1) acres as designated by the parties free from any claim of the Husband. At such time as all or any of the remaining approximately twenty-five (25) acres is sold, the parties as part of such sale shall affix the boundaries of the 5.1 acres by survey and the Husband shall quit-claim his interest in the said 5.1 acres to the Wife. The Husband shall be solely responsible for payment of the principal and interest on the note which is secured by a mortgage on the acreage and residence; he shall indemnify and save the Wife harmless from any liability on the same; and he shall make said payments until the subject note is paid in full. The Husband shall have the sole right to claim the interest paid on said note as a deduction for tax purposes.
* * *
 The Wife shall be responsible for any insurance associated with the residence and the 1.5 acres.
 Should the Wife sell the residence and 5.1 acres in an arms-length transaction prior to the payoff of the aforedescribed note on the property, the Husband shall pay to the Wife the deficit, if any, between the gross sale price less any remaining balance due on the first mortgage and 1.3 million. It is the intent of the parties that the Wife shall realize no less than 1.3 million on the sale of the property not including any and all costs of sale. For example, if the gross sale price is $1.5 million and the remaining note balance is $500,000.00, the Husband shall pay the Wife $300,000.00 ($1.5 million minus the $500,000.00 equals $1,000,000.00 and then $1.3 million minus this $1,000,000.00 equals the $300,000.00 obligation). Any balance due to the Wife shall be paid in equal monthly installments over the remaining term of the aforesaid note at Nine Percent (9%) per annum.
At the time the separation agreement was signed, Citizens Federal held a mortgage on the residence and thirty acres to secure a loan. The balance due on the loan was about $440,000. Monthly payments were approximately $5,700 and the payoff date for the loan was August 1, 2002.
Shortly after the decree was filed, Dr. Klug refinanced the loan. Because Mrs. Klug's name was on the property, Dr. Klug needed her co-operation and signature to refinance. The new loan, in the amount of $423,300, was financed by Banc One, and had a maturity date of February 1, 2024. This increase in the loan term reduced Dr. Klug's monthly payments to about $2,653. Dr. Klug testified that he needed to reduce expenses because his accountant had embezzled local, state, and federal tax money from the medical practice between 1990 and 1993.
After being told of Dr. Klug's financial bind, Mrs. Klug signed the necessary papers, and the new loan took effect on January 4, 1994. Dr. Klug was of the opinion that his "guarantee" obligation ended when the loan was refinanced, but he did not discuss this with his ex-wife at the time he obtained her agreement to the new loan. Nothing more appears to have happened until the spring of 1998. At that time, Mrs. Klug told Dr. Klug that she intended to move and wanted to sell the property. Dr. Klug then informed her that he intended to pay off the note and that she would realize no more for the property than its actual sale price. Subsequently, Dr. Klug paid off the Banc One loan on May 21, 1998, to further secure, in his own words, that he was "off the hook."
Dr. Klug also disputed the boundaries of the 5.1 acre parcel. As a result, Mrs. Klug filed a motion in the domestic relations case on March 19, 1999, asking the court to interpret the separation agreement. In the motion, Mrs. Klug asked the court to decide three issues: 1) when the boundaries of the 5.1 acre parcel had to be fixed; 2) what the boundaries of the parcel were; and 3) Dr. Klug's responsibility for the difference, if any, between the eventual sale price of the property and 1.3 million dollars. In this regard, Mrs. Klug's position was that the separation agreement was intended to equalize the division of assets between the parties. In particular, Mrs. Klug claimed that the clause quoted above was intended to guarantee her 1.3 million upon the sale of the residence and 5.1 acres, regardless of the sale price. The basis for this argument was that the 1.3 million amount was required to equalize the parties' assets.
Ultimately, the parties were able to agree on the boundaries lines, and the only issue remaining was the effect of the guarantee provision in the separation agreement. On February 22, 2000, a magistrate in the domestic relations court heard testimony from the parties, their former attorneys (Judge Jeff Froelich and Judge Thomas Hanna), and a real estate appraiser. The magistrate then issued a decision and permanent order on March 14, 2000, finding that Dr. Klug had satisfied all obligations to Mrs. Klug regarding the marital residence and 5.1 acres. In reaching this decision, the magistrate found the separation agreement unambiguous, and rejected all extrinsic evidence of the parties' intent, including the testimony of the parties' attorneys. Mrs. Klug then timely filed objections and supplemental objections to the decision. However, on August 24, 2000, the trial court overruled the objections and adopted the magistrate's decision as the decision of the court.
Mrs. Klug now appeals, raising the following assignments of error:
 I. The trial court erred by refusing to consider the extrinsic evidence offered by Mrs. Fender.
 II. The trial court erred by failing to apply fundamental principles of contract construction in interpreting the disputed provision and thereby failed to give meaning and effect to the intent of the parties.
 III. The trial court erred by interpreting the disputed provision in a manner inconsistent with fundamental principles of equity, good faith and fair dealing. Several sub-issues are also presented within each assignment of error.
 I
The first and second assignments of error deal with essentially the same issues, and will be considered together. In both assignments of error, Mrs. Klug attacks the trial court's finding that the disputed provision in the separation agreement was unambiguous. Mrs. Klug contends, instead, that the provision is ambiguous and that the court should have allowed extrinsic evidence to show the parties' intent. Additionally, Mrs. Klug claims the trial court failed to apply fundamental principles of contract construction when it interpreted the disputed provision.
In considering these matters, we begin with the proposition that separation agreements are binding contracts between the involved parties. In re Adams (1989), 45 Ohio St.3d 219, 220. Accordingly, separation agreements are subject to the same rules of interpretation as other contracts, and must be interpreted based on the parties' intention. Troha v. Troha (1995), 105 Ohio App.3d 327, 332 (citation omitted). In Troha, we noted that when a trial court enforces a separation agreement that has been incorporated into a divorce decree, the court has "authority to hear the matter, clarify any confusion over the interpretation to be given a particular clause, and resolve the dispute." Id. Furthermore:
 [w]hen a clause in a separation agreement is ambiguous, a court can resolve the dispute by considering not only the intent of the parties, but also the equities involved.
Id. at 335 (citation omitted).
Before we can reach the question of intent, however, we must first decide if the disputed provision is ambiguous. This is a question of law, and the trial court's decision is subject to de novo review. See, e.g., Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995),73 Ohio St.3d 107, 108, and Robinson v. Robinson (Dec. 3, 1999), Montgomery App. No. 17562, unreported, p. 6.
For analytical purposes, we will again quote the disputed provision, but will insert a number before each sentence:
 1) Should the Wife sell the residence and 5.1 acres in an arms-length transaction prior to the payoff of the aforedescribed note on the property, the Husband shall pay to the Wife the deficit, if any, between the gross sale price less any remaining balance due on the first mortgage and 1.3 million.
 2) It is the intent of the parties that the Wife shall realize no less than 1.3 million on the sale of the property not including any and all costs of sale.
 3) For example, if the gross sale price is $1.5 million and the remaining note balance is $500,000.00, the Husband shall pay the Wife $300,000.00 ($1.5 million minus the $500,000.00 equals $1,000,000.00 and then $1.3 million minus this $1,000,000.00 equals the $300,000.00 obligation).
 4) Any balance due to the Wife shall be paid in equal monthly installments over the remaining term of the aforesaid note at Nine Percent (9%) per annum.
As we mentioned, both the magistrate and trial court found the provision unambiguous. In particular, the magistrate decided that sentence 2 was a subjunctive clause, conditioned on an arms length sale prior to payoff of the note and mortgage on the property. The magistrate concluded that the clear intent of the entire provision was to protect Mrs. Klug from depletion of her proceeds upon sale if the mortgage had to be deducted from the sales price. However, since payoff occurred before sale of the residence, the clause and its formula were not actuated, and Dr. Klug, therefore, had no further obligation to Mrs. Klug. The trial court agreed with this interpretation.
After reviewing the provision, we disagree that sentence 2 is a subordinate or subjunctive clause. Instead, sentence 2, standing alone, expresses the parties' intent that Mrs. Klug would receive no less than 1.3 million dollars for the residence property whenever it was sold, less the expenses of the sale. We understand the trial court's theory that sentence 2 modifies the first sentence of the paragraph and operates only if the mortgage note existed at the time of sale. However, if this were the intent, the parties would have had no reason to insert sentence 2. Specifically, sentence 1 already says that if Mrs. Klug sells the house and 5.1 acres before the note is paid off, she will receive 1.3 million dollars, i.e., sentence 1 directs the husband to pay the wife the difference between 1.3 million and the gross sale price, minus any remaining mortgage balance on the note.
Accordingly, the parties must have had some reason to insert sentence 2. Another logical interpretation of sentence 2 is that the parties intended Mrs. Klug to receive 1.3 million for the house as her share of the property division, without limitation. This interpretation is consistent with the rest of the separation agreement, which clearly contemplates an equal division of property between the parties. For example, Section 15 of the agreement provides that Mr. Klug will execute a promissory note in the amount of $80,000 "to equalize the division of the parties' assets." Consistent with this intended equal division, the value of the real estate and limited partnerships Mr. Klug kept as a result of the separation agreement was approximately $1, 293,142. In comparison, the alleged value of the residence and 5.1 acres that Mrs. Klug kept was about $1,300,000.
Admittedly, the provision in question is not a model of clarity in drafting. For that reason alone, it could be considered ambiguous. Moreover, in contrast to the trial court, we think sentences 2 and 3 can be read together to furnish the guarantee suggested by Mrs. Klug. In other words, reading sentence 3 as subordinate to an independent sentence 2 is just as logical as tying the first two sentences of the paragraph together. Under this interpretation, sentence 2 indicates the parties' intent that Mrs. Klug will receive no less than 1.3 million on the sale of the property. Sentence 3 then provides the guarantee of payment as well as a method of calculating the guarantee amount. Notably, neither sentence says that a mortgage must be on the property. Further, while sentence 3 uses an example with a mortgage, the example is clearly illustrative and does not eliminate other potential scenarios. Thus, under sentence 3, assuming a sale price of $1,000,000 and a zero mortgage balance, the formula would read as follows:
 For example, if the gross sale price is $1.0 million and the remaining note balance is $0.00, the Husband shall pay the Wife $300,000.00 ($1.0 million minus the $0.00 equals $1,000,000.00 and then $1.3 million minus this $1,000,000.00 equals the $300,000.00 obligation).
Sentence 4 then sets out an allowable time frame for payment of the obligation, if any, to Mrs. Klug. Specifically, sentence 4 says that "[a]ny balance due to the Wife shall be paid in equal monthly installments over the remaining term of the aforesaid note at Nine Percent (9%) per annum." As we indicated earlier, a note with Citizens Federal was in effect when the separation agreement was signed. The term left on that note, at the time, was a little over nine years, i.e., from May, 1993 to August 1, 2002.
Although sentence 4 requires monthly payments over the remaining term attributable to the note, it does not condition payment on the existence of an unpaid mortgage. In fact, any note would already have been paid by the time sentence 4 took effect. Accordingly, we do not interpret the words "remaining term of the aforesaid note" to mean that the note obligation must be unpaid at the time of sale. Instead, we think these words simply provide a method for calculating the maximum time allowed for payment. For example, if the property sold in August, 1995, and a balance was due to Mrs. Klug, Dr. Klug would have about seven years, or until August 1, 2002 (the remaining term of the Citizens Federal note) to make monthly payments on the amount owed. By the same token, if the property sold in July, 2002, Dr. Klug would have to pay the entire balance almost immediately.
Because the disputed provision is subject to varying interpretations, we find merit in Mrs. Klug's claim that the trial court erred in finding the provision unambiguous, and in refusing to consider extrinsic or parol evidence of the parties' intent. As a result, this matter will be remanded to the trial court for resolution of the dispute. As we said in Troha, when a clause is ambiguous, the court can "resolve the dispute by considering not only the intent of the parties, but also the equities involved." 105 Ohio App.3d at 335. In this latter context, a few additional points are pertinent, as guidance on remand.
During the hearing in the trial court, Mrs. Klug presented evidence about an appraisal performed on May 21, 1993. This was about one month before the separation agreement was signed. The appraisal shows a value for the marital home, with ten acres, of only $635,470. However, the magistrate refused to admit the appraisal report for two reasons: 1) improper identification; and 2) lack of relevance. The basis for the former decision was the appraiser's alleged refusal to confirm or deny that the appraisal document was one he had sent to Banc One. Setting this point aside for a moment, we think the appraisal and additional testimony about the circumstances of the appraisal, would be relevant on remand to the equities. The magistrate and trial court, of course, did not reach this issue because they found the contract unambiguous.
As we mentioned earlier, Dr. Klug had a $440,000 loan on the property through Citizens Federal at the time the separation agreement was signed. This note is the one referred to in the separation agreement. About six months after the divorce, Dr. Klug paid off the Citizens Federal note by refinancing a note in the amount of $423,000 through Banc One. Significantly, Banc One is the bank for whom the appraisal was prepared for in May, 1993.
When the Banc One note was obtained, Dr. Klug believed that refinancing the original note would eliminate his obligation to guarantee the 1.3 million amount. In this regard, Dr. Klug testified that he would not have been able to refinance the loan without Mrs. Klug's agreement. However, when Dr. Klug obtained Mrs. Klug's assent, he did not share his view of the separation agreement.
During the hearing, Dr. Klug testified that he did not see the Banc One appraisal before the divorce. He also said he could not recall when he initiated the process to refinance the Citizens Federal mortgage. However, as we said, the appraisal document is dated May 21, 1993, and the client on the appraisal is listed as "Klug." Therefore, Dr. Klug's testimony might be viewed with some skepticism, particularly in light of his unconvincing testimony about how he arrived at the 1.3 million dollar value for the residential property. Specifically, Dr. Klug first said that he added $100,000 — $150,000 to the original property cost, due to road and sewer costs. However, the basis estimates used for tax calculations during the divorce negotiations did not include such an amount.
Second, Dr. Klug said that he added the potential capital gains tax ($260,700) to "get" the value of the property up to 1.3 million. This makes no sense. Either the property was worth 1.3 million between a willing buyer and seller on the real estate market, or it was not. Generally, "fair market value" is defined as the "price which would be agreed upon between a willing seller and a willing buyer in a voluntary sale on the open market." Wray v. Stvartak (1997), 121 Ohio App.3d 462,471 (citation omitted). See also, Larkey v. Larkey (Nov. 4, 1999), Cuyahoga App. No. 74765, unreported, p. 4.
Subtracting estimated capital gains tax or a pending mortgage from a sale amount makes sense in terms of arriving at the net value of a piece of property. However, the existence of a seller's potential capital gains tax on a sale does not increase the value of the property to a willing buyer. Therefore, the fair market value of the Klug property would have been the price which a willing seller and a willing buyer would have agreed upon in a voluntary sale on the open market.
Under the circumstances, a court considering the equities might find that Dr. Klug misrepresented the property value when the separation agreement was signed. Even an innocent mistake by Dr. Klug, and reliance by Mrs. Klug, could cause the equities to be weighed in Mrs. Klug's favor.
Accordingly, the May 21, 1993 appraisal and the circumstances surrounding the appraisal are relevant to the equitable issues that the court will consider on remand. Returning to the issue of proper authentication, we note that the appraiser who testified did identify the signature on the appraisal as his. The appraiser then went on to say that his business records had been negligently destroyed in 1997. On cross-examination, the appraiser again agreed that the signature looked like his own. However, he also said he could not be certain, because "forgeries could be out there." Additionally, the appraiser refused to testify about details of the appraisal, since he felt, for some reason, that his relationships with clients were confidential. This was clearly erroneous, as statutes and case law do not provide for confidentiality of an appraiser's reports or relationships. See, e.g., Ohio Rev. Code Chap. 4763.
Because the appraiser identified his signature, we think the possibility of a "forgery" is so remote as to be non-existent. In this regard, we note that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid. R. 901. Moreover, copies of records are routinely used in place of originals. Under the Rules of Evidence, duplicates are "admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid. R. 1003. The party opposing introduction of a duplicate has the burden of proving a genuine issue about authenticity. Enz v. Enz (June 5, 1998), Miami App. No. 97-CA-53, unreported, p. 7. And, the objection must be "`something more than a frivolous objection.'" Id. (citation omitted).
Based on the preceding discussion, the first and second assignments of error are sustained. This matter will be remanded to the trial court for resolution of the ambiguity in the separation agreement. In this regard, the trial court should consider extrinsic evidence of the parties' intent, as well as the equities involved.
 II
In the third assignment of error, Mrs. Klug contends that the trial court's interpretation of the separation agreement was inconsistent with fundamental principles of equity, good faith, and fair dealing. Due to our resolution of the first two assignments of error, this assignment of error is moot and will not be addressed.
In light of the foregoing discussion, the first and second assignments of error are sustained, and the third assignment of error is moot. Accordingly, the decision of the trial court is reversed and this case is remanded for further proceedings consistent with our opinion.
 ____________________ BROGAN, J.